### No. 27,849.

JOHN E. WELLS, *Appellee*, v. ROBERT H. HAZLETT, ROBERT H. BRADFORD, N. F. FRAZIER, JR., and JAMES DAVIS, *Appellants*.

(264 Pac. 19.)

#### SYLLABUS BY THE COURT.

1. BROKERS—*Construction of Agreement—Termination by Counter Offer—Procuring Purchaser Within Reasonable Time.* In an action for a commission for the services of a broker in negotiating a sale of oil leases, the evidence touching the nature of the broker's contract of employment considered and held to show that plaintiff's employment did not terminate when the prospective buyer did not in the first instance unqualifiedly agree to buy the property at defendants' specified price, but transmitted to defendants a counter offer to buy at a less price, nor when the prospective buyer submitted two other successive counter bids for defendants' property, and held that by the terms of plaintiff's employment he was given a reasonable time to induce his prospective purchaser to buy on defendants' terms, and held, also, that within such reasonable time he accomplished the purpose of his employment.

2. SAME—*Right to Compensation—Refusal of Principal to Consummate Deal.* Rule followed that where a broker has been employed to find a purchaser for his employers' property and is given a reasonable time to accomplish the purpose of his employment, and where the broker has expended time and energy pursuant thereto, and where the purpose of his employment is only defeated because his employers changed their minds and concluded to keep their property, the broker is entitled to compensation.

3. SAME—*Right to Compensation—Authority of Purchasing Agent.* An objection to the judgment that the officer in charge of negotiations for the purchase of the leases was not shown to have authority to purchase on behalf of his corporation, considered and not sustained.

4. SAME—*Special Findings—Evidence.* Objections to the jury's special findings on the ground that they were not supported by the evidence, considered and not sustained.

5. SAME—*Instructions.* Objections to the instructions given and refused considered and no prejudicial error disclosed therein.

6. SAME—*Knowledge of Sellers of Purchasers' Unqualified Acceptance—Evidence.* Record examined and held that the testimony and the evidence in-

---

Agency, 2 C. J. pp. 529 n. 36, 534 n. 83, 535 n. 96. Brokers, 9 C. J. pp. 624 n. 68, 654 n. 41, 660 n. 64, 663 n. 78; 49 L. R. A. n. s. 992; 24 A. L. R. 1551; 28 A. L. R. 893; 4 R. C. L. 251.

herent in the circumstances were sufficient to make it a jury question whether each of the four defendants was timely apprised of the prospective buyer's unqualified acceptance of the offer to sell at the price prescribed by defendants.

Appeal from Sedgwick district court, division No. 2; THORNTON W. SARGENT, judge. Affirmed.

*Charles G. Yankey, Joseph G. Carey, Austin M. Cowan,* all of Wichita, *C. L. Harris* and *J. B. McKay,* both of El Dorado, for the appellants.

*W. N. Banks, O. L. O'Brien, Walter L. McVey,* all of Independence, *A. M. Ebright* and *L. C. Gabbert,* both of Wichita, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: This was an action for a commission for a broker's services in finding a purchaser for certain oil and gas leases of Greenwood county land.

Plaintiff is a broker of oil and gas leases and resides at Independence. Defendants are oil producers and business men, three of whom, Hazlett, Bradford and Frazier, reside at El Dorado, and Davis, who resides in Wichita. Defendants are owners in common of certain productive and highly valuable oil leases in Greenwood county—one 240-acre tract and a three-fourths interest in an adjacent quarter section. Defendant Davis maintained an office in El Dorado where the accounts concerning their common business interests were kept, and where the defendants occasionally met for business purposes.

According to the least controversial aspect of the facts (almost every detail of which is in dispute) it appears that on Monday, February 8, 1926, the plaintiff by long-distance telephone communication made an engagement to meet defendant Davis at his office at El Dorado. Theretofore they were strangers. Plaintiff met Davis and defendant Bradford in Davis' office on Tuesday, February 9. Plaintiff stated that his business was to see if he could get a price on defendants' leases, as one of the major oil companies might be induced to buy them. David and Bradford replied that he would have to give the name of his prospective buyer. He said he hoped to interest the Prairie Oil and Gas Company. Davis and Bradford told plaintiff it would be necessary to consult their co-owners, Hazlett and Frazier; and the same day the four defendants met and fixed a price of $1,750,000 for their property, and agreed with plaintiff to pay him a commission of 5 per cent if he should induce the

Prairie Oil and Gas Company to purchase it. According to plaintiff's version of the employment, he was to have a reasonable length of time to accomplish this, which assertion of fact is emphatically denied by defendants. On Wednesday, February 10, plaintiff submitted to the Prairie Oil and Gas Company a written statement of defendants' property, giving its legal description, nature of title, ownership, number of producing wells, number of wells drilling, gross daily production, and other data, including defendants' price, $1,750,000. That company directed two of its officers to repair forthwith to Greenwood county to examine the property and the books and records in Davis' office concerning it. After two days' inspection by these officers, the Prairie Oil and Gas Company, on Saturday, February 13, offered $1,500,000 for the property upon certain conditions. This offer was received the same day by defendant Bradford, who replied that he was not interested in such an offer. It also appears that an officer of the Prairie company, Sidwell, had a telephone conversation with defendant Davis the same evening in which he says (but Davis denies) that Davis said the Prairie company would be given until Wednesday of the following week, February 17, to accept or reject defendants' original proposition. Plaintiff testified that Davis informed him that he (Davis) had given the Prairie company until Wednesday to accept or reject the original offer to sell at $1,750,000. On Monday, February 15, Meyer, officer in charge of negotiations for the Prairie company, told plaintiff his company would give $1,600,000. Plaintiff met Davis that evening and informed him of the Prairie company's latest bid. Davis told plaintiff to come to the office next morning and he would have the other defendants there and consider the offer. On Tuesday morning, February 16, plaintiff met defendants and told them of the $1,600,000 bid. This bid was rejected, and Hazlett, apparently speaking for himself and the three other defendants and in their presence, held a conversation with plaintiff to this effect:

HAZLETT: "Mr. Wells, you gave the Prairie our proposition just as it was given you, did you?"

WELLS: "Yes, sir."

HAZLETT: "That is, that the price of this property was to be a million seven hundred and fifty thousand dollars cash?"

WELLS: "Yes, sir."

HAZLETT: "This is their answer, is it—a million six hundred thousand, etc.?"

WELLS: "Yes; that is all there is to it, right now, all there is to it."

HAZLETT: "Now, Mr. Wells, we made this offer and the Prairie has rejected

it; and that offer is withdrawn, and this matter is closed as far as we are concerned."

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .

WELLS: "I don't think that you have any right to call this deal off at this time, and I am going over to the El Dorado hotel right away and phone the Prairie that you have refused the offer of a million six hundred thousand for the property and see if I cannot get them to give your price of a million seven hundred and fifty thousand dollars."

A sharp dispute next occurs as to what was said. Hazlett testified:

"I said, Mr. Wells, I have no control over the Prairie, could not keep them probably from making an offer, but so far as making an offer that has anything to do with our proposition to them, we won't consider it at all, and you don't represent us any further."

According to plaintiff's testimony, this was what occurred:

"Mr. Bradford asked me how long it would take to find out or hear from the Prairie whether they would increase the offer to $1,750,000 and I told him that Mr. Moody and Mr. Fitzpatrick and Mr. Kelsay [higher officers] were on their way to New York, and it might be necessary for Mr. Meyer to get in touch with them by telephone or telegraph before he had the authority to make an increased offer, but I think at best I can let you know definitely in a few hours. Mr. Hazlett said: 'Well, that is all right, you see if you can get the Prairie to increase the offer—to offer $1,750,000.'"

WELLS: "Well, where can I get in touch with you gentlemen as soon as I hear from the Prairie?"

Defendant Davis answered that he would see plaintiff at the hotel that evening. Within a short time plaintiff talked with Meyer, the Prairie company officer, and the latter said his company would pay defendants their price, $1,750,000, and that he would have a check for that sum in defendants' hands by noon the following day. Plaintiff informed Davis of that fact Tuesday evening, February 16, about 9:30 p. m.; but plaintiff added that the Prairie company wanted the taxes prorated, the transfer to be effective as of Saturday, February 13, and that defendants should go to Independence, headquarters of the company, to close the deal. Davis said he could not take the responsibility of accepting for his associates; that it was too late to see Hazlett who was 78 years old, and retired early; but that he would get the defendants together at his office next morning and call plaintiff at 9:30 a. m. Not until 2:30 p. m. next day did plaintiff meet defendants and when they did, Hazlett informed plaintiff, "We are not going to sell the property at this time." Plaintiff replied:

"Well, Mr. Hazlett, I cannot understand why you won't deliver the property to the Prairie because I have tendered you the Prairie's offer of a million seven hundred and fifty thousand dollars, which meets your price."

HAZLETT: "Well, it doesn't meet our proposition."

WELLS: "How doesn't it meet your proposition?"

HAZLETT: "Well, they say the transfer is to be effective Saturday. Since Saturday we have run seventeen thousand five hundred dollars worth of oil. Why should the Prairie have that much oil? As to the taxes being prorated to that date, the taxes haven't even been assessed, so we think the Prairie ought to pay the taxes, and as far as going to Independence we wouldn't think of it. This is our property; the Prairie is trying to buy it; if they want to buy it they will have to come here to our office."

Plaintiff said:

"It seems to me that these are all details of closing the deal, and I would like to call the Prairie right away, and I will have an answer back in a few minutes."

Within a few minutes plaintiff got in touch with Meyer, the Prairie officer, who agreed to waive everything in dispute. Meyer said:

" 'These are all minor details of the trade. You tell your principals the details have to be worked out some way, and we will be very glad to come to El Dorado, and we will leave right away. We will be there to-morrow and we will have our general counsel with us. . . . We will have a check to them by noon to-morrow. . . . Tell them that we will waive all the minor details and will arrange the details of the trade to their entire satisfaction.' He said they would have a check just a few hours after they got there, just as soon as the assignments could be made out and the abstracts checked."

Plaintiff then went back to Davis' office and told Davis and Frazier of the Prairie's acceptance and that its officers were coming to El Dorado. Frazier said: "Well now, that sounds more like it." Davis said he would talk with Hazlett and Bradford and see plaintiff the same evening at the hotel. At ten o'clock that night, Wednesday, February 17, Davis called at plaintiff's room in the hotel and said, "We have talked it all over with Mr. Hazlett and Mr. Bradford, and they have decided we don't want to sell the property at this time; however, we want you to tell the Prairie if we decide in the near future to sell this property we will give them the first opportunity to purchase it, and we will take care of you for your commission in case they do take it."

On Tuesday, February 23, plaintiff went to El Dorado where he met Davis and Bradford and endeavored to persuade them to go ahead and close the deal. Plaintiff testified:

"I tried to persuade them to go ahead and close the deal with the Prairie. I told them that the Prairie felt that they were morally bound. When they said they wouldn't go ahead and close the deal, I told them I thought I was entitled to some consideration in the matter, and they said they couldn't see it that way. That I hadn't sold the property and wasn't entitled to any consideration. They didn't pay me my commission and never have."

Hence this lawsuit for plaintiff's commission on the alleged ground that within a reasonable time he had effected the purpose of his employment, that of inducing the Prairie Oil and Gas Company to accept defendants' proposition to sell the property for $1,750,000.

Defendants separately pleaded general denials, admitted the fact of plaintiff's employment but denied its details as alleged by plaintiff, alleged that the only time allowed for the Prairie company's acceptance was until its officers could inspect the property and the books and records pertaining thereto, which was completed Saturday morning, February 13; and that the Prairie company's bid of $1,500,000 of that date following that inspection was in effect a rejection of defendants' offer to sell for $1,750,000, and that such counter offer ended defendants' liability to plaintiff for the commission demanded of them. Davis' separate answer continues:

"That on or about February 16, 1926, the plaintiff was informed and advised by these defendants that any propositions which might have theretofore been made were withdrawn. That at no time did the Prairie Oil and Gas Company ever agree to purchase said lease for $1,750,000 cash."

Bradford's separate answer pleaded the Prairie company's rejection of defendant's offer to sell by making a counter offer of $1,600,000, and—

"That thereupon plaintiff was informed by this defendant and his associates that all negotiations for the sale of the property to the Prairie Oil and Gas Company through plaintiff had been terminated by the rejections of the proposition as originally made by the defendant and his associates, and that this defendant and his associates did not care to and would not sell their property for $1,600,000."

The separate answers of Frazier and Hazlett were to the same general effect—the Prairie company's rejection of defendants' offer to sell for $1,750,000 by its counter proposals, the termination of the negotiations, and that the Prairie company never did unqualifiedly signify its assent to the price demanded by defendants.

The cause was tried before a jury, which returned a general verdict for plaintiff and answered special questions, some of which read:

"2. Did defendants tell plaintiff on February 9 they reserved the right to withdraw the offer at any time before acceptance? A. No.

"3. Was the Prairie Oil and Gas Company's investigation of the properties completed on February 13? A. Yes. . . .

"4a. Did the defendant Davis inform the witness Sidwell that the Prairie Oil and Gas Company could have until Wednesday to accept or reject the defendant's offer on the property? A. Yes.

"5. If you answer question No. 4 or 4a in the affirmative did any of the other defendants know of such statement being made to Sidwell by the defendant Davis prior to Tuesday, February 16? If so, which ones? A. All four.

"6. If you answer question No. 4 or 4a in the affirmative, did the defendants, other than Davis, agree to grant time until Wednesday or Wednesday morning? If so, which defendants did so agree and when did they give their consent thereto? A. Yes; all four—Tuesday, February 9, between 2 and 4 p. m.

"7. Did the defendant Hazlett, for himself and all the defendants, inform the plaintiff on Tuesday, February 16, that the deal was all off and the negotiations at an end? A. Yes.

"8. Did the Prairie Oil and Gas Company ever at any time accept the proposition as made by the defendant? A. Yes.

"9. If you answer the foregoing question in the affirmative, state when, about what time of day, and what officer or agent of the Prairie made the acceptance. A. Tuesday evening, H. A. Meyer, February 16, between 2 and 6 p. m.

"10. If you answer the foregoing question, state to what defendants said acceptance was communicated and when. A. James Davis. Tuesday evening, February 16, between 9 and 10 p. m., and to all four defendants Wednesday, February 17, between 2 and 4 p. m.

"11. Did the defendants give the plaintiff a reasonable time in which to sell the property in question to the Prairie Oil and Gas Company? A. Yes.

"12. Did the defendants give the plaintiff 10 days in which to sell the property in question to the Prairie Oil and Gas Company? A. Yes.

"13. Was the Prairie Oil and Gas Company ready and willing to purchase the property in question from the defendants, within the time fixed by the defendants for making the sale? A. Yes.

"14. Did the Prairie Oil and Gas Company, within the time fixed by the defendants for making the sale, accept unconditionally the offer of the defendants to sell the property to that company for a million seven hundred and fifty thousand dollars? A. Yes."

The trial court set aside special finding No. 6, and entered judgment for plaintiff in the sum of $93,337.08 and interest and costs.

Defendants assign many errors—that their demurrer to plaintiff's evidence should have been sustained; that error inhered in the instructions given and refused; and that some of the special findings were not supported by the evidence, but contrary thereto.

Just what was the nature of plaintiff's employment? It was to induce the Prairie Oil and Gas Company to buy defendants' property for $1,750,000. And in view of plaintiff's testimony and the evidence inherent in the circumstances, this court must regard it as

established that plaintiff was to have a reasonable time in which to accomplish the purpose of his employment.

Was there an unqualified acceptance? Assuming, as we must, the truth of that portion of the evidence which supports the findings, and particularly No. 14, there is little room for debate that eventually—after trying to buy for $1,500,000, $1,600,000, and by a bid of $1,750,000 with conditions—the Prairie company did unqualifiedly accept. On the evening of Wednesday, February 17, the Prairie company's officer said: "Tell your principals . . . we will waive all the minor details." This was an acceptance under the peculiar circumstances existing at that time. For twenty-four hours prior thereto defendants had been endeavoring to break off negotiations, and so far as they could do so, with due regard to the rights of their agent, they had withdrawn their offer to sell the property and had taken it off the market. Touching the "details" which the Prairie officer said had to be worked out in some way, they are usually present in every important business engagement, notwithstanding a binding offer and acceptance have been made by a seller and buyer. (*Hampe v. Sage,* 82 Kan. 728, 730, 109 Pac. 406.) And the law imposes on contracting parties the duty of dealing with such details in good faith so as to carry out and not defeat the contract of purchase and sale they have already made. In a transaction like the one negotiated by plaintiff, such details would probably include matters like these: When would it be convenient for vendors to give and for vendee to take possession? How would vendors apprise their workmen of the transfer of ownership? How should the current receipts and expenditures of the business be apportioned and wage claims verified and paid? Incidental matters like these would naturally inhere in the sale and transfer of an oil-producing property worth $1,750,000. To construe Meyer's language that such details "have to be worked out some way" and that he would "arrange the details of the trade to their [defendants'] entire satisfaction" as evidence that there was not an unqualified acceptance, does not fairly interpret either the attitude or the language of the Prairie company's officer. The fair interpretation was that defendants should have their own way about all such matters. (*Hampe v. Sage,* supra.) Furthermore, it must be observed that the sale of the property was not defeated because of Meyer's remarks about these so-called details nor because of these details themselves, but because defendants had changed their minds and had decided not to sell the

Wells v. Hazlett.

property. We do not overlook the fact that some rather important conditions or "details" had theretofore been attached to the Prairie company's earlier and successive bids of $1,500,000, $1,600,000 and $1,750,000—those relating to the taxes, division of the oil runs as of Saturday, February 13, the hundred-mile journey to Independence to close the deal, and a possible question whether vendors or vendees should pay for some well piping. It cannot be fairly said that the Prairie company did not eventually yield to the defendants on those matters, and the jury was justified in interpreting the facts to that effect. (*Putnam v. King,* 96 Kan. 109, 150 Pac. 539.) Nor can it be said that plaintiff took longer than a reasonable time to procure the Prairie company's unqualified acceptance.

A point strongly pressed by defendants is that the legal effect of the Prairie's counter offer of $1,500,000, $1,600,000 and $1,750,000 with conditions, was in each instance a rejection of defendants' offer to sell for $1,750,000 cash and without conditions. If the facts relating to the character of plaintiff's employment were as defendants testified and as they still contend, this point of law would be perfectly good. The law is well settled that a simple offer to sell may be withdrawn at any time before acceptance. But where an agent is employed to find a buyer and that agent expends time, energy, and perhaps money, pursuant to his employment, such withdrawal does not necessarily deprive the agent of his right to compensation for his service. (*Emerson-Brantingham Co. v. Lyons,* 94 Kan. 567, 147 Pac. 58; *Russell v. Combs,* 108 Kan. 411, 415, 195 Pac. 605; 2 C. J. 529, 534, 535.)

Here, apparently, the plaintiff was given a reasonable time to conduct negotiations with the Prairie company. At once he proceeded to expend time and energy to that end, and he was not long in getting results. Of course the Prairie company did not jump at the first chance to buy the property at the vendor's specified price. Naturally it first sounded the possibilities of buying for less. Furthermore, the plaintiff testified that while the price fixed by his employers was $1,750,000, and that they had admonished him the property was not to be hawked about, and that he was only employed to conduct negotiations with the Prairie Oil and Gas Company and that such negotiations must be expeditiously handled, when defendants engaged his services they did not tell him he was not to bother with any counter proposition of the Prairie company or any bid of less than $1,750,000.

18—125 Kan.

It is argued, however, that it is only where an agency is exclusive as well as for a given length of time that the agent cannot be deprived of his commission when he has expended time, energy and expense towards the accomplishment of his employment, where the employer changes his mind and concludes not to sell his property. But how can it be said that plaintiff's agency was not exclusive, if exclusiveness is an indispensable prerequisite to his recovery? He was the only agent employed to sell the property. In that sense it was exclusive. His agency was special. He was to negotiate for its sale to the Prairie company—no other. He was to have a reasonable time to do that. The evidence which the jury saw fit to believe reads:

"A. Well, this was the proposition that I had. That is, they gave me a price of $1,750,000 on the property, that I was to submit it only to the Prairie Oil and Gas Company, which I agreed to do. . . .

"Q. Just tell us the facts, that is all we want to find out? A. That I had a price of $1,750,000; that I was to put it up to the Prairie, and the Prairie only; I was to have a reasonable length of time to sell it at that price, and the Prairie was to have ample time to check the property, and that they would open all their records for the Prairie's inspection, and that they would hold the proposition open for a reasonable time. . . . I understood that a million seven hundred and fifty thousand dollars was their asking price. I didn't know they wouldn't take less for it. They hadn't said they wouldn't. . . . [Defendant Davis] also stated, 'We will give the Prairie ample time to check the property and will open all our records to their inspection and will hold the proposition open for a reasonable time. . . .'

"Q. Mr. Wells, in that conversation, was there anything said in addition to what you have already testified, as to what length of time that you should have to negotiate this deal? . . .

[Counsel for defendants]: "He has already testified that they were to have a reasonable time. . . .

"A. It seems to me, I asked Mr. Davis what he would consider a reasonable time, and that he countered by asking me what I thought would be a reasonable time, and I said, 'Well, I should think on a property of this size that the minimum time required would be ten days,' and as I recall he said that that would be all right and nodded his assent."

Another objection to the judgment is that Mr. Meyer, the Prairie company's officer in charge of the negotiations for the purchase of the property, was not shown to have authority to bind his principal. But the sale of defendants' leases to the Prairie company for $1,750,000 did not fail for any such reason, but because another oil well of large producing capacity on this property was brought in while its sale was being negotiated by plaintiff—the evidence which

includes the circumstances would permit that aspect of the case. The specified price of $1,750,000 would have been in defendants' hands by Thursday noon, February 18, 1926, in consummation of the sale effected by plaintiff if defendants had not decided to call off the deal.

Defendants strive to deduce something to their advantage from the special findings of the jury, particularly Nos. 8, 9 and 10. It is contended that plaintiff's own evidence did not support those findings, and that the acceptance by Meyer on the evening of Tuesday, February 16, communicated to defendant Davis that night and to all the defendants the following afternoon, still had attached thereto four conditions:

"1. Transfer to be effective at 7 a. m. Saturday, February 13. [Giving the Prairie $19,000 worth of oil.]

"2. Prorating of the 1926 taxes, none of which had been assessed. [$6,000.]

"3. Going to Independence to close the deal.

"4. Pay for the casing in transit. [$7,000.]"

As to the casing in transit, it is not clear that this item had been a conditional feature of the negotiations. Plaintiff testified that it was not, and the jury believed him. However, it is hardly a fair interpretation of special questions and answers Nos. 8 and 10 to read into them an unqualified acceptance and then demolish them by showing that there was no evidence to prove an unqualified acceptance until later, if at all. Mayhap the jury recognized that the acceptance found in answer to question No. 8 was not altogether unqualified, and apparently the trial court took the same view of the evidence, so far as concerned the attitude of the Prairie company as late as 4 o'clock p. m. on Wednesday, February 17. And so the vital question No. 14 was separately propounded, and it brought the answer which virtually settled this lawsuit.

We note, of course, that many of the findings, including No. 14, were attacked on a motion that they be set aside. A study of this record will not permit this court to assent to defendants' contention that these findings lacked support in the evidence, or that they are at variance with the plaintiff's own evidence pertaining thereto.

Various errors are predicated on the instructions given and refused. Those refused dragged out to unnecessary length the simple legal proposition that no one of the defendants was to be considered as the agent of the others unless such fact was established by evi-

dence, direct or circumstantial. That matter was sufficiently covered by one instruction which the court did give, No. 16, which it is needless to repeat herein. Nothing in this record suggests that this action sought to subject defendants to a liability as partners or because they were tenants in common. Their liability was simply based on their joint contract in employing the plaintiff to negotiate a sale of their property to the Prairie Oil and Gas Company. Requested instruction No. 9 dealt somewhat with the requisites of a binding contract with a corporation, the necessity of the assent of its board of directors, and that the corporation must have been shown to have been able, willing and ready to buy at the price fixed by the defendants. As we have already noted, the sale of this property did not fail because of any of those matters; there was no merit in that phase of the defense to this action; and the trial court dealt with it with more patience, consideration and care than it deserved.

One of defendants' many complaints with the instructions was that those given did not fairly state the attitude of defendants, which was that when the Prairie company made its counter proposal to give $1,500,000 (or either of its later offers which admittedly did not amount to an unqualified acceptance) such counter proposal was a rejection of defendants' offer to sell for $1,750,000 and terminated the negotiations and relieved them altogether of liability to plaintiff. We think the issues were sufficiently stated in instructions given, and while they covered more at length the matters which plaintiff had to prove in order to prevail, and in making it clear to the jury that their verdict should be for defendants if plaintiff failed in his proof in any material respect, the instructions, Nos. 1, 5b, 14a, 14b and 15, fairly and fully covered the pertinent law governing defendants' theory of the case. Thus, in Nos. 14b and 15 it was stated:

"14b. You are instructed that according to the plaintiff's theory he was authorized to get an acceptance or rejection of a proposition to sell the properties in question for $1,750,000. . . . Any offer or acceptance by the Prairie Oil and Gas Company different from this, either in price or in any other terms was not an acceptance, but a counter proposition, and in law amounted to a rejection of the offer made by the defendants.

"15. If you find that the plaintiff was not given any definite or specific time, but was only to have a reasonable time for the Prairie Company to make its inspection and then to accept or reject defendants' offer, as above stated, and that defendants reserved the right to withdraw the offer at any time before acceptance, and that defendants did in fact withdraw their offer before ac-

Wells v. Hazlett.

ceptance, and notify plaintiff of such withdrawal, then plaintiff cannot recover, and your verdict should be for the defendants, even though the Prairie Company subsequently accepted such offer."

It is urged that the evidence fails to show that the fact of the Prairie company's unqualified acceptance was ever brought home to each of the four defendants. There was direct and positive testimony that defendants Davis and Frazier were told of it on Wednesday night, February 17. A week afterwards, plaintiff spoke to Bradford and urged that defendants reconsider their attitude and let the Prairie company have the property. The evidence other than the circumstances is not clear that the fact of the Prairie's eventual, unqualified acceptance was brought home to defendant Hazlett, but we cannot say the circumstances did not warrant the submission of that disputed fact to the jury.

We must conclude. There are other arguments urged against the judgment, none of which has been overlooked or slighted, but we discern nothing therein to justify further discussion. The briefs of counsel contain much good law well fortified by citations of authority which would have been very helpful if the proper disposition of this appeal depended upon nice questions of law. But it does not. This was a fact case, important only because of the large sum of money involved. The jury's verdict has settled the facts, and notwithstanding the diligence and zeal of counsel this court is unable to discover any error of sufficient gravity to permit the judgment to be disturbed.

It is therefore affirmed.

Burch, J., dissenting.